May it please the Court, my name is Frank Reagan, and with me is Attorney Julie Blair on the argument. With the Court's permission, I would like to address the Brady issues, and Attorney Blair will address the sentencing issues. This matter presents the question of a Brady violation and what is the responsibility of the United States Attorney's Office in light of a Brady violation. Kyle's v. Whitley teaches that when one shows a Brady violation, the absence of the favorable evidence could reasonably be taken to put the case in a different light as so as to undermine the confidence in the verdict, a reversal is required. I believe that that's what we have demonstrated here. And the government, in their response, addresses the question by saying this is simply impeachment evidence and it's cumulative. And I would submit to the Court that what has been disclosed post-trial by the Office of the Inspector General of Investigation is misconduct by the government agents, and such as that if that were revealed and we were allowed to present that as a part of our entrapment defense, it would be a very different trial. The trial would be in an entirely different light. Okay. So let me try to understand. In your view, the material that was omitted was Brady material? Yes, Your Honor. There was a Brady violation. I do believe it. What exactly – when did the Brady violation occur and what did it consist of? Your Honor, I think there are two answers to that question. First – One answer would be even better. All right. I'll try to do it in one answer then. I believe this violation – Why should it be difficult? You're claiming there was a violation. Okay. Yes, Your Honor. Okay. There must have been a point in time in which it occurred, right? Yes, Your Honor. Not two points in time. It began – So when did this happen? Let's start with time. It began with before the trial. In June of 1995, the trial judge ordered that all Brady information be turned over as soon as possible, but no later than July 29, 1995. Right. The Brady letter that the government characterized as revealing all the benefits was sent in February – middle of February 1996. I looked for the Brady letter in the excerpts and I couldn't find it. Do you have it? Did you put it there? I think we did, Your Honor. I'll have to check. I don't have it at my fingertips right this minute, but I can check, Your Honor, when I sit down. What do you think we're going to talk about this morning? Your Honor, I have set forth – You claim that there was a Brady violation. You tell me the Brady violation happened in this letter. You don't know where it is. Well, Your Honor – I couldn't find it in the excerpts. Maybe you have it somewhere hidden, but isn't this the kind of thing you should have at your fingertips? Yes, Your Honor. Throughout the course of the trial – So how can we talk about what was in the letter and how the letter, in your view, violated Brady? Because the government in the letter – and I apologize for not having it on my fingertips – but they set forth what they disclosed in Mr. O'Neill's testimony at the evidentiary hearing as all the benefits, and he did not enumerate – Sorry, the testimony happened later. Yes, Your Honor. How could they disclose that in the letter? What did the letter say? The letter said that they were withholding deportation for Mr. Blandone and that he had been a person involved in drug trafficking for some period of time and that he was receiving money from the government for his cooperation. Okay. And what do you think should have been in the letter? I think the government should have disclosed that the immigration agent, who was a part of the OCDETS task force, secured lawful permanent resident status for Mr. Blandone in violation of law in 1994 and 1995. That would have led to the presentation of the petition. A little bit of a hard time of how you can obtain lawfully permanent resident status for somebody in violation of law. I mean, it's not like obtaining a check. If it's in violation of law, then it's not valid and you don't really have permanent resident status. What you then have is a forged green card. So I'm not quite exactly sure what it is you think should have been in there. In 1994, Agent Tellez secured for this man, Blandone, a lawful permanent resident status and a green card. That was characterized as being a valid green card at that time. It was only later when the higher echelon ---- I'm asking you what you think the letter should have said. The letter should have ---- I don't know why I'm having so much trouble communicating. You claim it was a brevity violation. I asked you what it was and when. You focused on this letter. I asked you what the letter said, and you explained to me from your recollection. I'm asking you what the letter should have said. The letter should have said that in 1994, a member of the OCDETS task force secured for Mr. Blandone, in violation of law, a lawful permanent resident status, which enabled him to remain in the United States, to bring his family to the United States, to secure citizenship and all the benefits of citizenship to this person. Now, later, as the Court knows, that was rescinded when the Immigration and Naturalization found out how Mr. Tellez had done this. But at that point in time, it was a valid legal document that he was using. Mr. Cummings, I thought during trial, Mr. Blandone said that his green card was illegal. He said words to that effect. He said, as a convicted felon, it's illegal for me to have a green card. But with the blessing of the United States, he had it. When I'm ‑‑ Okay. I'm also trying to figure out how much of this is left after the first case. Because the first ‑‑ after the first case, they said that Mr. Blandone was so thoroughly impeached and discredited that, you know, adding any more to it wouldn't make any difference. Your Honor, I don't think this is simply a matter of impeachment of Blandone. I think it shows a misconduct by the government agents that ties very neatly hand in glove with the entrapment defense. The agents working for the OCDETF task force were willing to overstep their bounds in securing this lawful permanent resident status for him, much as they did in securing the conviction in the entrapment of Mr. Ross. Let me see if I understand. Even though the Brady violation might be harmless in the sense that he's already thoroughly impeached, it's nonetheless important to the entrapment defense. I thought your argument was that nonetheless this was so terrible that the indictment should be dismissed because this was outrageous government conduct. That's the second issue, Your Honor. I'm asking for each. I don't really understand how the Brady violation, if it's not important to impeachment, is important to the entrapment defense. Because it shows that the government agents, the OCDETF task force, were willing to overstep their bounds and act beyond the law in securing a lawful permanent resident status for Mr. Blandone and at the same time overstep their bounds and inducing Mr. Ross to participate in this cocaine transaction. But I don't see how the two are related. The district court found that Mr. Blandone was extremely excited and happy to get back in the cocaine business and that he wanted to be a big player and that, in fact, the amounts of cocaine that he was dealing in were the amounts he wanted to be dealing in. So if she finds all this about the intent of Mr. Blandone, how does this matter? How does what you're saying matter? The way it began was at one and two kilos, and then it went to six kilos, and then it jumped up to 50 and then 100 kilos. And so it's our position that it was through the inducement of Mr. Blandone that Mr. Ross, who had first talked about one or two kilos, ended up at a meeting where there were 100 kilos of cocaine. The other aspect of this, Your Honor, that ---- So given the remand for resentencing, which is what this Court said, how did you get into district court on this argument? By virtue of Rule 33 and newly discovered evidence, Your Honor. What's the deadline for a Rule 33 motion based on newly discovered evidence? Well, I think it's, if I remember properly, seven days after the conclusion of a trial or whatever period of time the Court allows. But I think in this instance it was two years for ---- I think it was two years, Your Honor. Well, if it's newly discovered evidence, which seems to me that's what you have to say, is that you didn't know what had gone on with this witness during the first trial. So you have newly discovered evidence, and the rule says three years after verdict. Now, as I looked at the record, the verdict was March 19, 1996, and the motion was filed or they tried to file it on August 11, 1999, more than three years later. So as a Rule 33 motion, isn't it out of time? I don't believe it is, Your Honor. I believe that the district court found that it was within the time prescribed by Rule 33. Well, okay, but justify it. In other words, I can add up the months on the calendar, and to me you're well over three years. If that's true, how were you in court given the remand only for resentencing? I don't have the answer for that, Your Honor, at my fingertips. I know that when I appeared in front of the district court, I explained that to the district court sufficiently that the district court believed that we were within three years. And if the district court is wrong as a matter of law, then that's something we can address, I take it, because it looks jurisdictional under Rule 33. I think that's yes, Your Honor. All right. Was there any kind of tolling applied? There was an appeal. Throughout that period of time, he was on appeal. Would that toll the period? I'm sorry, Your Honor? Would that toll the period? I believe ñ I think it does toll the period, Your Honor. Well, not exactly. I don't have a case or a ñ Not exactly. What the rule says is that if the case is on appeal, it says if an appeal is pending, the court, the district court, may not grant a motion for a new trial until the appellate court remands the case. So in the usual situation where something comes up while a case is on appeal, there's a motion to the district court to tell us, would you consider a motion, and then we remand the case for the purpose of allowing the district court to consider the motion. But until we do that, the district court has no jurisdiction. But the three years, as I read it, continues to run. So in order to stop the three years, there has to be something done. I don't think ñ I don't believe that we really knew of this information in any real specific way until after this Court had ruled in the earlier appeal. And it may be that just like any statute of limitation, it runs and that's the end of it, because I don't see many holes in Rule 33. Well, I believe, Your Honor, that it may have been told during that period of time we were on appeal. I remember ñ I know that I researched this question extensively in the district court, and I'm sorry, but I just don't have the answer on my fingertips. I looked at your brief, and the only thing you mentioned in your gray brief about how you got into the district court was Rule 33. Yes, Your Honor, I think that's correct. There was also a writ of habeas corpus, I believe, filed concurrently with the Rule 33, setting out these same grounds. And I believe that the judge dismisses or addresses that in her opinion. There was a concurrent writ of habeas corpus filed. Are you appealing for the denial of that as well? Your Honor, I think that the Court, having found that she had jurisdiction under Rule 33, didn't address the writ of habeas corpus any further. Well, so then what? Is it still on her docket there? I think it was dismissed, Your Honor. And you didn't appeal? Not from that, no. Your Honor, I ñ So if you're out of luck here, you're out of luck there, too, because you didn't I think that she ñ I don't have the answer for that. I'm not sure of that, Your Honor. Your Honor, it seemed to me that what we had here is almost a systemic violation of Brady, because the district court ordered in early ñ in June of 95 that Brady be turned over. Nothing was turned over until trial. After the trial, it came to light that there was this violation brought out by the OIG. None of that was revealed to the defense, to the district court. Then when we were on appeal, the Attorney General's ñ the U.S. Attorney's Office filed a brief saying that everything had been turned over when they knew full well at that time that this OIG investigation was going on. And when the U.S. Attorney argued in front of this Court, they knew that the OIG had concluded that things were missing, that Brady violations had occurred, and yet they represented to this Court that there was no Brady and that everything had been turned over. And I would submit to you that ñ But the Court was later informed by a letter from defense counsel about the OIG investigation and nevertheless issued its ruling. It didn't seem to be ñ Actually, Your Honor, I believe it was a letter from the defendant that he sent, I believe, without the assistance of counsel, a letter to this Court and to the government and to the defense. He became aware of this before I did. So the Court was made aware of this. What is it exactly that you think ñ was it Mr. O'Neill who argued this? Yes, Your Honor. Before this Court? What do you think? You're claiming he misrepresented or omitted? Yes, Your Honor. Okay. Tell us what it is. I think he should have told this Court. The Court, when we argued in 98, had real questions about Brady at that time and why it had been delayed. Do you have a transcript of that? Yes, Your Honor. And it's a part of the record. Where is it? Do you have that? Transcript of the Ninth Circuit argument? Yes, Your Honor. It is a part of what we did conclude in the brief. You're talking about 98. The 98 argument. Before the first trial. After the first trial, which occurred in 1996, this was the 1998 Court of Appeals argument. And at that time, what he should have done is he should have advised the Ninth Circuit of the OIG investigation. Can you give me a page number? Yes, Your Honor. Excerpt of Clerk's Record, Volume 1, page 37. Page 37. And what is it that – wait, I'm sorry. This looks like direct testimony. Maybe it's the other Volume 1. I have Nixon direct. That's not it, right? Is it the – oh, it's the brown one. The brown Volume 1, Your Honor. The brown Volume 1. The appellant. Okay. So why don't you tell me what it is that was misrepresented, that was said that was wrong. Well, Mr. O'Neill did not tell the Ninth Circuit that there was an Office of Internal Affairs investigation and the results of that investigation. I'm sure there's lots of things he didn't say, but you said there were misrepresentations to this Court. I'd like to know where the misrepresentations are, where it is that he said something that misstated the facts or that implied something that wasn't true. At page 42, one example of this is the Court asks a question, and Mr. O'Neill responds, if there is nothing in the file that is exculpatory of the defendant, and there is nothing. I'm sorry. Where are you reading from? Page 42, Your Honor. That's the middle of the page. Okay. What's where is the misstatement here? Well, the import of that to the Court is that everything has been provided that's exculpatory or that benefits Mr. Ross. It doesn't sound to me like any of the stuff was exculpatory of the client. It may have made the government's evidence or witnesses look bad, so it might have been impeachment, but how is this exculpatory? It's not simply a matter of making their witnesses look bad, Your Honor. It fits hand in glove with the entrapment defense. It's the misconduct of the government that should have been allowed to be given to a jury to make the determination. Here we are all these years later trying to figure it out when, if the government had revealed it at the earliest possible point, it could have been resolved then. Okay. Your Honor, I just want to make this one last point. This has gone on throughout this case, and I know that if you look at the order the judge issued in June of 1995, it wasn't complied with. Nothing was done until the time of trial. When evidence was learned after the trial, nothing was provided. What do you do with the district court's ultimate finding that this would not have been admissible anyway? Even if you'd been given all this information, it would not have been admissible. So maybe there was a Brady violation, but it didn't really cause it. Well, I respectfully disagree with that decision of the district court. I think at the time of the trial, in the context of the trial, a trial attorney trying to persuade a jury, for which Mr. Ross is entitled, that he was entrapped could have adduced this information of the government's misconduct with respect to their primary witness. I don't understand. I respectfully disagree that 403 or the evidence, the statement is that it would take too long to present. It wouldn't take too long to present. It would be a relatively short thing. In fact, the government would probably stipulate to it, if we had known at the time, because they wouldn't want all the facts coming in. Mr. Bland didn't testify, right? He did. Did the INS agent testify? No, not Mr. Tellez, who got him the green card illegally. It would have been a great impeachment for him if he testified, but he didn't testify. How do you impeach Tellez with – I mean, how do you impeach Bland with Tellez's bad acts? It's not simply – if we had known it, we would have been able to call Mr. Tellez. But it's – once again, Your Honor, and I don't want to – Call and just impeach him? No, no, no. Call and just say, oh, here's a bad guy who works for the government? Well, I'd like to do that. But what it would do, Your Honor, is it would demonstrate a pattern of misbehavior by the government that fits in with the entrapment defense. That's why it's a benefit. It's almost like a prior similar act that we would have of the government misconduct that would fit hand in glove with the entrapment. Okay. Thank you. Thank you, Your Honor. We're out of time. You're going to need more time for co-counsel to talk about the – Your Honor, could I give her a couple minutes in light of the Court's questions? Thank you. Thank you, Your Honors. I will be brief. I would like to discuss the sentencing entrapment issue. In this case, the co-defendants were granted a downward departure for sentencing entrapment. Mr. Roth should have been granted the same downward departure, or his base offense level should have been lower to a 32. The district court found that the $170,000 for 100 kilos of cocaine was in no way reasonable. There was no way that you could purchase 100 kilos of cocaine for $170,000. The most that you could purchase was 11 or 12 kilos of cocaine. So it was clear that the government manipulated the sentencing. Wasn't that just a down payment? Well, that's what the government contends, but there's no evidence that there was any other money available. Mr. Roth was not in charge of the money. The other two co-defendants were in charge of the money. And the only money they brought to the table was $170,000, and there was no evidence that there was any other money out there and that any other money would have been paid. And the Court found that this was the case because she found in the co-defendant's case that a downward departure was warranted based on the fact that the government manipulated the sentence by bringing 100 kilos, even though there wasn't anywhere near the amount of money to buy 100 kilos of cocaine. But we don't usually review the refusal of a district court to depart downward. Are sentencing entrapment departures different than other departures that we don't review? Well, it's my contention, Your Honor, that this would be clear error in this case. But that's not the point. In other words, if a district judge knows that she has discretion to depart and refuses to depart, we have even said that we cannot review that decision. Now, why is this departure decision different? Well, it's unclear whether the district court knew that she had the discretion to depart in this case. Was it argued? It was argued. Okay. Even if the district court doesn't say anything, if the parties present the departure information and say, you can do this if you want, and the government says you can do it if you want, but you shouldn't, and the judge just says, I'm not going to grant the departure, we say that's an exercise of discretion. And then she grants the departure to the court offenders, as you said. Yes. We know she knows how to do it. But she never said in this case, in this sentencing, this is the resentencing of Mr. Ross, she never said, I'm choosing not to depart. What she says instead is, to avoid appellate review, I'm going to grant one level for all of your departures that you brought forth today because I don't want to be reviewed by the court. And I'm going to say that by doing that, I don't have to be reviewed. And we think that the court should have an obligation to either grant or deny her departures. But you read her thing. I thought she clearly indicated she knows she can make departures, and that what you're saying, she said, I didn't remember those exact words, but that would indicate, okay, it's a discretionary thing that can't be reviewed. You know, it seems to me, what you really – I think if you have this alternative argument that this goes to the calculation of the drug amount. Correct. So, which is something that can be reviewed, right? Right. That it could be a base offense level of 32 rather than a base offense level of 36, which is another way that the court could have gone with the sentencing, making it not a departure, but rather a change in the base offense level. So you made that argument, and she said no to that? She never clearly said no to anything. She just merely said what the court's going to do. She clearly said she agreed with the pre-sentence, with the probation department's way of doing this. Calculating it as a base offense level of 36 rather than 32. Right. So she clearly said that. She did say that she was agreeing with the probation officer's calculations. Okay. So that sounds like, to me, she's saying 36, not 32. It could be interpreted that way, or it could be interpreted that she just was not making a decision on it. I mean, I think her statement is that she's disregarding the minimum mandatory and just taking the totality of circumstances so that she can't be reviewed as to the minimum mandatory or as to the extent of her departures. And I think that they should be reviewed. She's clearly saying that she doesn't want to make an apprendi mistake, so she's doing it that way. But she also said that, in addition, when she was considering the other grounds for departure, which we also raised in this appeal, that she should have considered the other grounds for departure, the substantial assistance to the legislator, et cetera. But she extensively went through that and said, those facts were talked about, the evidence was put on, and at the end she says, I'm not going to depart on that. No. She simply says that I'm going to take this all into consideration for one lump sum and give one point for Cook and Coon. She never grants or denies a departure based on any of those bases that were raised. She never says, I'm denying this, I'm denying that. She says, I'm going to give one point to avoid appellate review for all of your bases for departure. Is the extent of a departure reviewable, or the Court grants a departure in part? Can we review how much was granted? Well, I think that in this case she's not individually considering each departure, and I think that is reviewable. Well, if you asked for a total of 12 levels in departure and you got one, it seems to me she's pretty effectively denied 11 twelfths of it. Well, she's giving one point on another basis is what she did. She gave it under Cook and Coon. The rest of us were not. You walked out of there with no departure. Well, that's a pretty good denial, isn't it? Well, I think it's the way that she worded it that she was going to take this all into consideration. Was she denying it? Was she saying that each one was worth one-tenth of a point? What we make of that is the first Ross panel thought he was going to get a 260-month sentence, and she only gives him a 240-month sentence. I think that the Ross panel was concerned with the three-strikes law, and that's the focus of that memorandum of opinion. I think we should jack it up 20 months. You know, law of the case and everything. No, we don't think so. Maybe you better sit down and vote. Thank you, Your Honor. We'll hear from the government. Thank you, Your Honors. May it please the Court. Mark Rahe for the United States. To go first to the Brady issue, Your Honors, I don't know if it's really particularly helpful to claim that the government violated Brady because of what it was ordered to disclose in June of 1995. I think the undisputed record here shows we're talking about one item here, the fact that Agent Ellis, special agent of the INS, secured a green card for an informant when he should have. This information did not even become aware to the prosecutor. It wasn't even disclosed until after the trial. But it doesn't matter, of course. Is our ultimate point. It doesn't matter whether it was disclosed to the prosecutor or not. He's charged with that knowledge. So we have to assume Mr. O'Neill knew all about this. Well, I don't know. I don't – I would disagree respectfully, Your Honor, because – and I would say two things. The Office of Inspector General. Do you think it's your answer to our question? No, I haven't, Your Honor. Well, it's the law of the circuit. It says that everything known to the agent is known to the prosecutor. Yeah. Well, if I have to proceed on that assumption – I'm really surprised you haven't read it. You didn't put it in your brief. You do have an obligation to cite in your brief controlling authority directly on point. You know that. I do, Your Honor. Okay. It's a 1995 case, Ninth Circuit. United States v. Zuno, R.C. I would have thought any prosecutor would know this.  I'm sorry, I don't, Your Honor. Sure. Should I read you what it says? Because I'm sure you're not going to forget Zuno, R.C. again. Even if the prosecutors were not hiding the statement until the defense could no longer make practical use of it, it is the government's, not just the prosecutor's, conduct which may give rise to brevity violation. Prosecutors and investigators must often be tempered in the service of what they see to be justice and protection of the public from crime to increase the probability of success by depriving the defense of evidence which might tend, in their view, to confuse and mislead the jury. Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it when an investigatory agency does. That would undermine brevity by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decides the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials until he asks for them. It is true that the prosecutor need not comb the fronds of every federal agency which might have documents, and the disclosure obligation should turn on the extent to which the prosecutors have knowledge of and access to the documents. However, the prosecutor is deemed to have knowledge of and access to anything in the custody and control of any federal agency participating in the same investigation of the defendant, citing In the earlier case, I think you asked this. This is Brian. Possibly, you understand that? Did you get an importance of that? If the agent knows it, the prosecutor knows it. If Mr. Tellers knew it, Mr. O'Neill knew it. We don't play metaphysics here, trying to guess what was known. We don't look into the agency's decision-making or communications. Tellers knew it. O'Neill knew it. It's been the law of the circuit for eight years. I can't believe that the United States Attorney's Office in the Southern District of California is not aware of this obligation, and I hope I can count on you that when you get back to your office, you will send a memo around reminding your colleagues of Zunar's obligation and bodies. Let's start again. Very well, Your Honor. Okay. The government was ordered to disclose Brady, and it failed to do so in its letter to counsel prior to trial. Right? Right. Then we ask the question, controlling laws, should this case be reversed? Is this a Brady violation? Presumes that the evidence had to have been favorable. Is the law of this circuit also clear? Okay. So had the government complied with Brady, it would have said what, counsel? Just tell me exactly what they would have said in the letter. Do we have a copy of the letter for some reason? I have a copy. For some reason. I have a copy of the letter. It was not included in any excerpts of the record. I have one right here, if Your Honor would like to see it. Oh, I certainly would. I most certainly would. Now, why defense counsel chose to leave it out of the excerpts is a mystery to me, given that it's sort of the key document on which their claim of Brady violation was. And I even bracketed on the second page, Your Honor, what I believe would be the pertinent paragraph. Okay. But I would imagine what the letter should have said then was that this agent tell us secured a green card in September of 1994, October of 1994, for an informant who had already had an aggravated felony drug conviction, and therefore he should not have done that. And now the question is. Well, I think what it would have disclosed is that Mr. Blandon's, among the benefits given to him by the government, was a green card. That he was given permanent resident status, and therefore he could not be deported. Right. That's what the letter would have disclosed. It did. Okay. And I know what it does say is that deportation proceedings were not commenced and that he therefore retains the permanent resident status that he had. There is a reference to permanent resident status in that paragraph. I think then the question becomes to what extent did this affect the trial? A two-week trial where it. I think this reflects, you know, O'Neill is deemed to have known what Telus knows. This reflects O'Neill's reading of the file. Correct. Which is. Deemed to give him the impression that he already had permanent resident status. Right. Which was a misperception. Okay. So the letter would have said not that he gets to keep his permanent resident status, but he was given permanent resident status. That's what it probably should have said. Actually, let me make sure I understand. So this letter presupposes he has permanent resident status, when in truth he did not have permanent resident status, and therefore was far more subject to being deported. Because he didn't have a valid green card. Right. Under the argument as you explained to defense counsel. I mean, he had it, but if it was never legally given in the first place, I suppose the truth is that he never had it. So then one could argue or the defense could argue that he was more in the government's grip because among the things that the government could do is deport him since he was not here permanently. To that degree. Right. But our position is that that is not. Let's make sure I understand. So what they would have known had Mr. O'Neill disclosed what he should have, is that his make copies of this that that that the key guy here, Mr. Blanton was in fact subject to one more. There was one more pressure point with him vis-à-vis the government. There's one more thing they could do to him. Since he didn't have permanent resident status, since he didn't have a valid green card, they could deport him and deport his family and so on. I gather that would be correct. Okay. But our point, as Judge Rustani pointed out, this was cumulative to testimony that Blanton presented at trial. And that really is the focus of our argument, is that Blanton was thoroughly impeached. He was impeached every way from Sunday. The jury knew that he had done a life, well, not a lifetime, but at least five to seven to eight years of serious drug trafficking, that he had earned millions of dollars. He never had to pay a fine. At his first sentencing, he was looking at a 10-year mandatory minimum, probation department recommended life. He ultimately received a 48th sentence, and actually I think he only did 28. But wouldn't, given that is the case, that is what he had done, wouldn't the fact that the government was willing to procure him a green card make it seem like even a greater reward? They take this total scum who's done all of these things, and as a reward for what must have been very valuable services to the government, they give him a green card, something that every immigrant would love to have, gives you all sorts of protections against deportation and so on. So wouldn't that have, you know, so the way one impeaches informants is by stacking all of the things, all the goodies the government gives, thereby tending to show the jury not only that he's a bad guy, but also that the government is paying him off for what might very well be false testimony. Your Honor, I would disagree that this one extra fact would be significant enough to warrant a new trial. So you think, for example, if they had, let's say they had given him $20,000 for his testimony, and that had been omitted. Let's say secretly they had given him $20,000, and for some reason Mr. O'Neill didn't know about it or whatever, but he should have known, omitted it. You think that that would also have been cumulative? Well, that's a little harder to answer, because in reality that was before the jury. The jury found out that he received not $20,000, but $40,000 for his involvement. Okay. So that makes it easier to, let's say they had omitted this part. They had omitted the $40,000. And then we said, now we discovered that, in fact, under the table he got slipped $40,000. We know that was omitted, right? Right. You think that would have been cumulative? I probably still would take that position based on the fact that that was not deemed cumulative by the district court. And why was it omitted again? What did the $40,000 have to do with anything? That was his reward money. The reward money. It was a benefit conferred upon. And why did that matter? Well, that was just part of the disclosure. In fact, it's in that letter. Okay. Well, no, I understand. But why was it omitted? Why was the benefit omitted? It was just in there, Your Honor. Defense didn't object, so there was never any argument over that. I mean, I think it's speculation. Wasn't it the defense who offered it and prosecuted the object? No. I believe that the prosecutor fronted this information in his direct testimony. Fronted the information because he was afraid that otherwise the defense would bring it out. I suppose so, Your Honor. Okay. And you think, then, that the additional fact that they're giving him an illegal green card is not like the $40,000? I mean, I'm sure there are many people willing to pay $40,000 or better for a green card issued by the government. I'm sure there are many people out there. Right? I mean, it was clearly a very valuable, valuable document. A green card enables him to stay here, enables him to bring his family. It's a — particularly for somebody with a felony who is otherwise ineligible for a green card. You don't think this kind of reward given to the key witness by the government is the kind of thing that would have been admissible at trial to show that here's one more thing that they're paying him off for his testimony? Well, but they did elicit the fact that his green card was illegal. This is not a case where there was no discussion whatsoever about the immigration benefits. I'm sorry. I'm — that it was illegal? Yes. Blandone testified that — twice conceded that if an alien has a drug conviction, he should be deported. His testimony was that, in my case, the government didn't go through the normal procedures. And then I know on cross-examination, the defense counsel said, Mr. Blandone, isn't it illegal for you to have that green card? Prosecutor opposed the objection. The question was asked again, isn't it illegal for you to have that green card? Yes. This evidence was in front of the jury. Well, but that really puts the question quite the opposite way. That sounds to me like, gee, didn't you get an illegal green card? Didn't you lie and cheat the United States government by getting a green card? It's quite different to say, didn't an agent of the INS give you a green card even though you are not legally entitled to it? That's a very different question. Getting somebody to admit that they obtained an illegal green card, there must be 6 million people out there who obtained illegal green cards who would be able to answer the question. But there are not very many people out there who can say I met with an INS agent who doctored my A file and got me a green card from the government that, if examined by an INS agent, if run through the computer, would look and act just like a real green card. That's pretty unusual. That is a valuable thing. And you think this is something that would not have been admitted just along with the $40,000? Well, I don't know if I understand Your Honor's question exactly. If it had come out, if it had been included here, you don't think that this is something that would have been admitted in impeaching Blanton in saying, look, you got $40,000 and you got this really valuable document, a genuine fake green card? I mean, it's not just a piece of plastic, but it's a piece of plastic that if anybody wants to check up on it, they would be able to find the immigration A file. They would open it up and it says right there, issued by, you know, I mean, it's quite a remarkable document, right? It is. I mean, sometimes it's like apples and oranges to a 2-year-old. I know earlier you asked, well, compared to $20,000, I mean, to many people in the United States who are already citizens, they may not even give a second thought about an immigration benefit. So their money is often the most important thing. Well, yes, I think if you're already a U.S. citizen, then being able to get permanent resident status is not such a hard deal. But I think for the rest 6 billion other people in the world, I think they would know the difference. But anyway, there it is. I'd like to ask you a question. It seems to me that your opposing counsel is kind of, is moving us away from the issue of impeachment because I think that's more or less precluded by Ross 1. They said that Blandin is so thoroughly impeached it doesn't matter. And, well, the evidence was overwhelming, and therefore he's thoroughly discredited and it doesn't really matter. But I think what he's trying to do this morning is to say that, look, the evidence wasn't so overwhelming, and you can see that from the newly discovered evidence, and that is that this is evidence that he was entrapped, so that Ross 1 is undercut and we're not bound by this holding of overwhelming evidence because now we've got this newly discovered evidence. I guess that's what he's saying. So can you respond to that argument? Oh, absolutely, Your Honor. And the way we look at it, entrapment has two elements, inducement, predisposition. How is this material to either element? First we look to the inducement, and this is a point I want to be clear about. Agent Tellis never had anything to do with this investigation as far as face-to-face negotiations with this defendant. The defendant's central and only defense was entrapment. Never denied knowledge of drugs, never denied participation in negotiations. He wants the jury to believe, wants his court to believe that the government acted overwhelming force on him. Agent Tellis was a behind-the-scenes immigration agent on a task force, one of many people. His duty was to preserve the immigration matters. I don't see how it's an all-relevant or probative of the inducement against Mr. Ross that an INS agent who was behind the scenes, who had nothing to do, over four to five months of face-to-face negotiations with Mr. Ross, how that could be enough to warrant a new trial. And it's also important, Tellis was not part of the government's case in chief. There was never any reliance on any of his testimony for the government's case. So as far as inducement, I don't think this new evidence had anything to do with that. Now, as far as predisposition, even if you disagree with me on inducement, the evidence of predisposition here was overwhelming. And that is something that will take this case, should also lead to affirmance, because when one looks at the record, this was four to five months of negotiations. And I know that the defense wants to characterize Glenn as the star witness. In many ways, he was, but the case did not rest entirely on him. What you also have were these tape recordings of the undercover communications negotiations with Ricky Ross. And it's not once, not twice, but several times where he reflects a complete opposite of reluctance. He's excited about this deal. From the first phone call on October 16, 1994, he says, what price, man, what price? Can I get a little something right now, which means one or two kilograms of cocaine? The second conversation, October 31, 1994, also recorded, again, at the end of this conversation, can I get a little something right now? December 1994, in the middle of December when there was that meeting with Chris, and Ross allegedly asked for 50 kilograms of cocaine to go to Atlanta. Now suddenly the quantity's getting larger. It's not the government that's suggesting these increases in quantity. It's Ricky Ross. Then we move closer to the arrest in 1995. Tape recording, or this particular conversation wasn't tape recorded. Ricky Ross calls Glandon to say, I have new people. He's going out, proactively securing new financing for this deal. And then there's even a recorded call. I believe it was February 24. The jury heard this evidence. It says, from Ross, we're going to make a lot of money. I mean, if that's, again, not predisposition, I don't know what it is. And then even towards the end of February, when they actually are finalizing the terms of the deal, there's even evidence in the record that Ross asked for heroin out of nowhere. And there were never even going to be ---- You have to have both inducement and predisposition. So you may be very solid in the predisposition, but that does not strengthen the other part. And I think that's where the defense thinks that the evidence would have made a difference. By showing overreach by the government, showing the willingness to commit illegality, the willingness to break the law on the part of various members of the team. And that was a theory, that what they were doing here, they were acting illegally. But then maybe that brings me back to the point I tried to make when I first stood up here, Your Honor, which was ---- You should really be indifferent about retrying the case if it's so solid. You should say, well, you know, we really want to do it right. We should have disclosed information. Well, my God, you know, we have a good, solid case. Why would we have to do it again? Well, Your Honor, I think then in this ---- Right? I mean ---- It does matter, though, to what extent the prosecutor was involved. And I don't think the district court didn't hold six months of hearings for nothing. I mean, there's these insinuations throughout a lot of defense papers that this was a grand conspiracy. That was never the case. I don't know what kind of delusions you guys are on down there, but we have law that says the prosecutor knows everything. So I don't know why you have to have these hearings of who knows what or who knew what. You know, don't you read my circuit law? Oh, I do. It's pretty clear that if the agent knows it, the prosecutor knows it. And that's it. It's not a question of fact. It's a question of law. So the prosecutor is going around with this knowledge and doesn't disclose it. Didn't disclose it when he had the whole argument hearing, the whole IG investigation. Is this Mr. O'Neill who was U.S. attorney for a while, the interim U.S. attorney? He was, I believe, an assistant in our office. Then he went to Nevada, and that's where he's now. But is he the one who was in the interim U.S. attorney after the ---- No, that's Patrick O'Toole. O'Toole is not O'Neill. Okay. It was somebody else. No, but in this case, though, I think it also goes to the second issue on the defense, because defense has separated these issues out as far as why didn't the district court dismiss under its inherent supervisory powers. And I think in that ---- for that issue, at least, it is ---- it does have to be relevant to what extent the entire prosecution ---- Well, but there was a ---- there was a constellation of remedies dismissing, as happened ultimately in Kodjan, when the district court came ---- case came back and said, you lied to me? That's an extreme remedy. There is certainly in between remedy is simply vacating this conviction and not dismissing the indictment, but vacating the conviction and having the government do it again. Right. So that ---- you don't need to have the extreme remedy of dismissal of indictment Kodjan precludes, precludes retrial. And the question is, why wouldn't the government want to do it again? Right. If, you know, you had a big problem, I mean, you had a ---- you had within the prosecution team, you had a crook. It did affect the presentations made to the court and the closing counsel, and I would think that you'd be anxious to say, look, we don't need to rely on crooks. We want to do it right. Well, Your Honor ---- You'd be perfectly happy with that, I would guess. You might, but also Brady jurisprudence is filled with cases where there are allegations that this wasn't done right, this wasn't done right. This case, as Your Honor knows, is before this Court for the second time. It's been going on for years. Already a lot of resources have been devoted to this. The district court, who was presided over the trial, presided over a six-month evidentiary hearing. And you would feel better getting a chance to do it right, you know, just knowing that there was no ---- that this wouldn't make you feel as a servant of the people. I don't know if my position ---- Representative of your government. Well, Your Honor, my position is that I feel fine enough with the case as it has been, and I have tried to present that case. The government had overwhelming evidence against this individual. Unfortunately, Mr. Tellis acted outside his mandate. But the district court, who presided over the trial ---- Would you have disclosed it in the letter? If I had known it, yes. Okay. Thank you. Thank you. You're way out of time. We'll give you a minute for rebuttal. Thank you very much, Your Honor. Appreciate it. In the original brief filed by the government in the first appeal at page 80 and 81, the government states, Ross's main complaint was that the government, although it had turned over virtually its entire file and had provided every scrap of benefit Blandon received in this or any other case, declined to turn over the file of the original investigation into Blandon himself and declined to turn over files of other investigations in which Blandon had participated. So I wanted to make sure there is a representation to this Court that everything had been turned over. And at page 23 of my brief ---- So this happened when? This is in the brief of the government filed in the original appeal, 19 ---- I believe the mailing date on the brief is August 25th, 1997. And the OIG investigation ended in 96. It commenced in August of 96, and I believe it actually ended. There was a draft report sent to the U.S. attorney in November of 97. And then ---- So this was before the brief was filed? Yes, Your Honor. No, I'm sorry. The brief was filed first. August. And then they received the draft report after. But during the OIG investigation, the OIG conducted taped interviews of Mr. O'Neill, of Mr. Ross, of all the people that had contact with the case. So everyone ---- I mean, there was some indication then that there was the OIG was going on. The other point I wanted to make was that government counsel says that Tellez was far removed from Mr. Blandone. Tellez was working with Mr. Blandone and other members of the OCDETF task force in a very close unit. He was the person who got him out of custody and secured for him his lawful permit. But Zubri didn't exactly cite Zuno R.C. either. Your Honor, I cited Kiles v. Whitley, which is the United States Supreme Court case that states that ---- I know Kiles v. Whitley. Kiles v. Whitley says there's a duty to investigate. It's quite different from saying the prosecutor knows everything that the ---- Kiles, remember, is a state habeas case. This is a ---- rather than a case involving a federal prosecution. So the standard is quite a bit more lenient than applicable to United States attorneys in federal criminal cases. And that law said by Zuno R.C. says you owe ---- you know everything your prosecutors know. Thank you, Your Honor. Thank you. Okay. Case is argued. Stand submitted.
judges: Kozinski, Tg Nelson, Restani